Gants, J.
The plaintiffs, Michael Bergin, Joseph Galligan, Sr., Gary C. Liddicoat, Robert Setteducati, and James A. Villa, all of whom are officers or employees of the broker-dealer H.J. Meyers & Co., Inc. (“HJM”), have brought this action under G.L.c. 30A, §14, seeking judicial review of a Final Order of the defendant Diane Young-Spitzer, Acting Director of the Massachusetts Securities Division, dated October 29, 1998.
BACKGROUND
On October 23, 1997, the Massachusetts Securities Division, a department within the Office of the Secretary of the Commonwealth, filed an Amended Administrative Complaint against HJM, Michael Bergin, Joseph Galligan, Sr., Gary C. Liddicoat, Robert Setteducati, and James A. Villa, as well as William Masucci and Michael Hart.[1] The case against Hart was subsequently dismissed by the Securities Division. (The remaining respondents shall be referred to collectively as “the respondents.”) After roughly 30 days of hearings over 5V2 months before the Hearing Officer, generating nearly 4,000 pages of hearing transcript, the Hearing Officer concluded in an 81-page Decision dated October 7, 1998 that all the remaining respondents (except Liddicoat), had:
1. willfully violated G.L.c. 110A, §101, which makes it “unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.” G.L.c. 110A, §101; and
2. violated G.L.c. 110A, §204(a)(2)(G), which authorizes the Secretary of the Commonwealth, if in the public interest, to impose an administrative fine or censure or to deny, suspend, or revoke any registration of a registrant who has “engaged in any unethical or dishonest conduct or practices in the securities . . . business.” G.L.c. 110A, §204(a)(2)(G).
Decision at 79. The Hearing Officer also concluded that all the remaining respondents (including Liddicoat):
3. violated G.L.c. 110A, §204(a)(2)(J), which authorizes the Secretary of the Commonwealth, if in the public interest, to suspend or revoke any registration if he finds that the registrant has “failed reasonably to supervise agents, investment advisor representatives or other employees to assure compliance with this chapter.” G.L.c. 110A, §204(a)(2)(J).
Decision at 79. The Hearing Officer recommended that each of the individual respondents, except Liddicoat, be fined $10,000 and that Liddicoat be fined $5,000. He also recommended that the Order then in effect temporarily barring HJM from doing business in Massachusetts “be dissolved only upon conditions which the Secretary deems appropriate to insure the protection of Massachusetts investors.” Decision at 80.
On October 29, 1998, Acting Director Diane YoungSpitzer of the Securities Division in her Final Order adopted in their entirety the Hearing Officer’s findings of fact but she modified his recommendations. She ordered that the registration of HJM as a broker-dealer with the Securities Division be revoked and that the registrations of Bergin, Galligan, Masucci, Setteducati, and Villa as broker-dealer agents with the Division also be revoked. She further ordered that Liddicoat’s registration as a broker-dealer agent be suspended for two years. She imposed administrative fines of $150,000 against HJM, $10,000 against the individual respondents other than Liddicoat, and $5,000 against Liddicoat. She also ordered all respon *56 dents permanently to cease and desist from violation of “the Act.” Although she did not identify “the Act,” one can infer that she was referring to the Uniform Securities Act, G.L.c. 110A.
The Acting Director did not give any reasons or provide any explanation for imposing far more severe sanctions than those recommended by the Hearing Officer. In addition, the Acting Director declared that she modified the Hearing Officer’s conclusions of law, but she did not identify any conclusion of law that she had modified nor indicate how she had modified it.
The Hearing Officer’s findings of fact, which the Acting Director adopted in their entirety, were written almost entirely by attorneys for the Securities Division. Of the 349 findings of fact, 329 (more than 94 percent) were taken verbatim from findings proposed by the Securities Division; none were taken from the findings proposed by the respondents. The Hearing Officer, in his Decision, declared:
I freely acknowledge my use of proposed findings of fact and conclusions of law provided me by both counsel for the Division and the respondents. Although I adopt such findings and conclusions (in addition to my own), I want to emphasize that everything set forth in this Decision is the result of my own observations and beliefs. Nothing suggested by counsel is accepted at face value. This Decision, right or wrong, accurate or inaccurate, is my own.
Decision at 2.
All the respondents, except HJM and Masucci, now seek review of the Acting Director’s Final Order under G.L.c. 30A, §14. In reviewing that Final Order, this Court will first determine the standard of review that should be employed and then, applying that standard, determine whether the Final Order is supported by substantial evidence.
DISCUSSION A. The Standard of Review
G.L.c. 30A, §14 grants any person who is aggrieved by a decision of any agency in an adjudicatory proceeding the right to appeal that decision to the Superior Court. This Court may reverse or modify the agency decision “if it determines that the substantial rights of any party may have been prejudiced because the agency decision is . . . based upon an error of law; or . . . unsupported by substantial evidence; or . . . arbitrary or capricious, an abuse of discretion, or otherwise not in accordance with law.” G.L.c.' 30A, §14(7). This determination must be based upon consideration of the entire record. Id. When reviewing an agency’s decision, “the Court shall give due weight to the experience, technical competence, and specialized knowledge of the agency, as well as to the discretionary authority conferred upon it.” Id. The reviewing Court may not substitute its judgment for that of the agency. Southern Worcester County Regional Vocational Sch. Dist. v. Labor Relations Committee, 386 Mass. 414, 420-21 (1982), citing Olde Towne Liquor Store, Inc. v. Alcoholic Beverage Control Comm’n, 372 Mass. 152, 154 (1977).
When reviewing an administrative decision, “substantial evidence means such evidence as a reasonable mind might accept as adequate to support a conclusion.” G.L.c. 30A, §1(6); Salaam v. Commissioner of the Dept. of Social Services, 43 Mass.App.Ct. 33, 34 (1997). “A decision is arbitrary and capricious when it lacks any rational explanation that reasonable persons might support.” Cambridge v. Civil Service Commission, 43 Mass.App.Ct. 300, 303 (1997). The appealing parties (the respondents) have the burden of showing that their substantial rights have been prejudiced by the agency’s error. Catlin v. Board of Registration of Architects, 414 Mass. 1, 6 (1992).
The fact that more than 94 percent of the Hearing Officer’s findings of fact were taken verbatim from the Securities Division’s proposed findings of fact does not void his findings nor displace the standard of review set forth in G.L.c. 30A, §14. See Commonwealth v. Hawkesworth, 405 Mass. 664, 670 (1989); Cormier v. Carty, 381 Mass. 234, 237 (1980). But it is not without consequence. The Supreme Judicial Court has justly criticized trial court judges “for failing to heed our repeated cautions not to adopt proposed findings verbatim." Commonwealth v. Hawkesworth, 405 Mass, at 669. The Court explained:
In so doing, the judge undermines the utility of fact finding, which is to “(1) insure the quality of a judge’s decision making process by requiring simultaneous articulation of the judge’s underlying reasoning; (2) assure the parties that their claims have been fully and fairly considered; and (3) inform an appellate Court of the basis on which a decision has been reached.”
Id. quoting Cormier v. Carty, 381 Mass, at 236. Since the findings adopted by the trial judge become his own, they continue to be subjected to the usual standard of review. Cormier at 237; Hawkesworth at 670. “Nevertheless, findings which fail to evidence ‘a badge of personal analysis’ by the trial judge must be subjected to stricter scrutiny by an appellate court.” Cormier at 237, quoting In re Las Colinas, Inc., 426 F.2d 1005, 1010 (1st Cir. 1970). See also Hawkesworth at 670. Stated differently, “the greater the extent to which the Court’s eventual decision reflects no independent work on its part, the more careful we are obliged to be in our review.” Cormier at 237, quoting In re Las Colinas, Inc., 426 F.2d at 1010. Pragmatically, this means that “we shall be more likely in a close case to disregard a finding, or remand for further findings where the judge has neither personally prepared the findings, nor ‘so reworked a submission by counsel that it is clear that the findings are the product of his independent judgment.’ ” Cormier at 237-38 quoting Markell v. Sidney B. Pfeifer Foundation, Inc., 9 *57 Mass.App.Ct. 412. 418 (1980). These same principles apply with equal force to an agency decision prepared by a Hearing Officer.
B. The Legal Grounds for Administrative Sanctions
Before examining the evidence in the record, it is important first to look to the grounds found by the Hearing Officer and adopted by the Acting Director of the Securities Division for imposing administrative sanctions against the plaintiffs. Under G.L.c. 110A, §204(a), the Secretary of the Commonwealth “may by order impose an administrative fine or censure or deny, suspend, or revoke any registration or take any other appropriate action if he finds (1) that the order is in the public interest and (2) that the applicant or registrant or, in the case of a broker-dealer or investment adviser, any partner, officer, or director, any person occupying a similar status or performing similar functions, or any person directly or indirectly controlling the broker-dealer or investment adviser” has engaged in specified misconduct or become subject to specified orders. G.L.c. 110A, §204(a). Among the misconduct that may warrant these administrative sanctions are:
1. Willfully violating or willfully failing to comply with any provision of Chapter 110A, the Uniform Securities Act. G.L.c. 110A, §204(a)(2)(B); or
2. Engaging in any “unethical or dishonest conduct or practices in the securities . . . business.” G.L.c. 110A, §204(a)(2)(G).
The Secretary of the Commonwealth “may by order deny, suspend, or revoke any registration if he finds (1) that the order is in the public interest and (2) that the applicant or registrant:
(J) has failed reasonably to supervise agents, investment advisor representatives or other employees to assure compliance with this chapter ..." G.L.c. 110A, §204(a)(2)(J).
It is plain from the language of the statute that the Secretary is not authorized to order an administrative fine based on a finding solely of a failure reasonably to supervise, which is precisely what the Hearing Officer recommended and the Acting Director adopted with respect to the respondent Liddicoat. The imposition of this fine against Liddicoat is an error of law.
It is impossible for this Court to determine whether the Acting Director made other errors of law in her Final Order because she did not provide any conclusions of law. Rather, she wrote, “After reviewing the record, I hereby adopt in their entirety the findings of fact and modify the conclusions of law and recommendations set for [sic] in the Hearing Officer Report.” The Final Order is silent, however, as to what those modified conclusions of law were. I suspect that she meant that she was modifying only the recommendations of the Hearing Officer and adopting both the findings of fact and the conclusions of law, since every sentence in the conclusions of law of the Hearing Officer came from the Securities Division’s proposed conclusions of law. Yet, the plain language of her Final Order leaves ambiguous what her conclusions of law are and this alone requires remand to the Securities Division, since no order may enter under G.L.c. 110A, §204 without written conclusions of law. See G.L.c. 110A, §204(f).
In addition, the Acting Director failed to provide any explanation of her reasons for substantially increasing the sanctions recommended by the Hearing Officer. This failure alone also requires remand to the Securities Division, since this Court cannot determine whether her decision regarding sanctions was arbitrary and capricious because “it lacks any rational explanation that reasonable persons might support” without knowing what that explanation is. See Cambridge v. Civil Service Commission, 43 Mass.App.Ct. at 303.
If we assume for the moment that the Hearing Officer’s conclusions of law were intended to apply, it is important to look at how those conclusions defined the legal standards for each of the three violations.
1. Willfully violating or willfully failing to comply with any provision of Chapter 110A, the Uniform Securities Act.
G.L.c. 110A, §204(a)(B).
The Hearing Officer found that all the respondents but Liddicoat willfully violated G.L.c. 110A, §101, which makes it “unlawful for any person, in connection with the offer, sale, or purchase of any security, directly or indirectly (1) to employ any device, scheme, or artifice to defraud, (2) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading, or (3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person.” The Hearing Officer did not address in his conclusions of law whether he believed there was any vicarious responsibility for this violation. This omission is critical since the Hearing Officer did not find that any individual respondent directly engaged in any of this misconduct.
This Court understands that a willful violation of G.L.c. 110A, §101 sufficient to trigger administrative sanctions under G.L.c. 110A, §204(a)(2)(B) against an individual cannot be vicarious but must be supported by evidence that a respondent in some fashion participated in the misconduct, either by doing it, assisting in it, directing it, encouraging it, or protecting it. See In the Matter of the Stuart James Co., Inc., [1992-93 transfer binder] CCH Fed.Sec.L.Rep. ¶85,129 at 84,090-91 (1993) (distinguishing active direction or participation from a failure to supervise): Fox Securities Company, 45 S.E.C. 377, 383 (1977) (respondents who were found to have aided and abetted violations could not also be held responsible for supervisory *58 failure); R.A. Johnson & Company, 48 S.E.C. 943, 947 n. 14 (1988) (same). Indeed, if vicarious responsibility were sufficient to support administrative sanctions, it would make no sense for the Legislature to have made a reasonable failure to supervise a separate basis for sanctions, since the supervisor would be vicariously responsible for the misconduct of his subordinate regardless of whether or not his supervision was reasonable. The fact that the Uniform Securities Act makes a reasonable failure to supervise a separate basis for sanctions but excludes fines from those sanctions demonstrates that the Legislature intended to distinguish between a supervisor who somehow participated in wrongdoing and a supervisor who failed to prevent the wrongdoing through inadequate supervision.
This legal conclusion finds further support from the language of G.L.c. 110A, §204(a). A close reading of that statute makes clear that the registration of any registrant, including any registered agent of a broker-dealer, may be revoked if the Secretary finds that the registrant has willfully violated any provision of Chapter 110A, including G.L.c. 110A, §101. See G.L.c. 110A, §§204(a) and 401. A broker-dealer’s registration may be revoked if the Secretary finds that “any partner, officer, or director, any person occupying a similar status or performing similar functions, or any person directly orindirectly controlling the broker-dealer” has willfully violated any provision of Chapter 110, including G.L.c. 110A, §101. See G.L.c. 110A, §§204(a) and 401. Therefore, while a registered agent, like the individual respondents, may have his registration revoked or suspended only if he, himself, willfully violated a provision of Chapter 110A, a broker-dealer, like HJM, may have its registration revoked or suspended if a partner, officer, director, or control person willfully violated a provision of Chapter 110A. This limited vicarious responsibility applies only to the broker-dealer (here, HJM), not to the registered agents (here, the individual respondents). See Uniform Securities Act, §204, Comment (Clause J), Uniform Laws Annotated (Business and Financial Laws) (1985) at 545 (“This Act . . . does not authorize the Administrator to proceed against the registration of a broker-dealer merely because one of his agents has violated the statute (unless the agent happens to be a director, officer or partner)”).
This Court recognizes that the Uniform Securities Act,, with respect to civil liability, imposes vicarious joint and several liability for a fraudulent sales transaction illegal under G.L.c. 110A, §101 upon every person who directly or indirectly controls the seller “unless the non-seller who is so liable sustains the burden of proof that he did not know, and in exercise of reasonable care could not have known, of the existence of the facts by reason of which the liability is alleged to exist.” G.L.c. 110A, §410(b). This provision, which essentially imposes vicarious liability upon a control person with an affirmative defense, applies to civil liability only, not to administrative sanctions. Not only is this apparent from the plain language of the Act, but it is supported by the different legal requirements that apply to these separate remedies. A civil cause of action under Section 410 requires only a violation of Section 101; an administrative sanction under Section 204 requires a wilful violation of Section 101. The Commentary to the Uniform Securities Act makes it clear that, while the word “willfully” means simply that “the person acted intentionally in the sense that he was aware of what he was doing,” ”[t]he principal function of the word 'willfully' is thus to serve as a legislative hint of self-restraint to the Administrator.” Uniform Securities Act, §204, Comment (Clause B), Unform Laws Annotated (Business and Financial Laws) (1985) at 545.
Such “self-restraint” is appropriate because of the difference between civil liability and administrative sanctions. It is perfectly sensible for the Legislature to protect victimized securities purchasers by expanding the number of parties jointly and severally liable for a misrepresentation through vicarious liability and yet be unwilling to impose administrative sanctions that can deny someone their livelihood based solely on vicarious responsibility for the conduct of subordinates.
This Court also recognizes that, although the Hearing Officer did not address this issue in his conclusions of law, the Securities Division stated at the hearing, in successfully challenging the respondents’ motion for a directed verdict, that the fraud of the principals of a firm can be established either “by active participation or by vicarious respondeat superior.” See Administrative Record (“AR”) at 2808. The Hearing Officer declared that he was adopting the legal theory that an individual principal is vicariously responsible for fraud unless he shows through an affirmative defense that he did not know and should not have known of the misconduct. See AR at 2810, 2817. To the extent that the Hearing Officer’s findings that all respondents, except for Liddicoat, willfully violated G.L.c. 110A, §101 is premised on this conclusion of law, that finding is premised on an error of law.
2. Engaging in any “unethical or dishonest conduct or practices in the securities . . . business.” G.L.c. 110A, §204(a)(G).
The Hearing Officer also found that all respondents except Liddicoat violated G.L.c. 110A, §204(a)(2)(G), which authorizes administrative sanctions when a respondent has “engaged in any unethical or dishonest conduct or practices in the securities . . . business.” G.L.c. 110A, §204(a)(2)(G). The same issue as to vicarious responsibility arises with respect to this finding of a violation and this Court reaches the same conclusion — this violation cannot be proven by vicarious responsibility but must be supported by evidence that a respondent in some fashion engaged in the misconduct, either by doing it, assisting in it, directing *59 it. encouraging it, or protecting it. Indeed, by the very language of the statute, this basis for administrative sanctions can be shown only if the respondent “has engaged in any unethical or dishonest conduct or practices.” G.L.c. 110A, §204(a)(2)(G) (emphasis added). The Legislature’s choice of the verb “engaged” requires some active participation in the misconduct, not the inaction that would be sufficient if there were vicarious responsibility for the misconduct of subordinates. Moreover, there is not civil liability for “engagling] in any unethical or dishonest conduct or practices” apart from the limited dishonest conduct specified in G.L.c. 110A, §410, so the vicarious liability with an affirmative defense provision in the latter statute does not even apply to most of the conduct violative of the former provision.
3. Failure reasonably to supervise agents . . . or other employees to assure compliance with this chapter . . ." G.L.c. 110A, §204(a)(G).
The Hearing Officer found that the meaning of a reasonable failure to supervise agents or other employees to assure compliance with G.L.c. 1 lOAmay be understood by reference to the counterpart of this provision in federal law, Section 15(b)(4)(E) of the Securities Exchange Act of 1934, 15 U.S.C. §78o(b)(4)(E), which provides for sanctions against a broker-dealer who has:
failed to reasonably supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation, if such other person is subject to his supervision. For purposes of this subparagraph (E) no person shall be deemed to have failed reasonably to supervise any other person if — (i) there have been established procedures, and a system for applying such procedures, which would reasonably be expected to prevent and detect, insofar as practicable, any such violation by such other person, and (ii) such person has reasonably discharged the duties and obligations incumbent upon him by reason of such procedures and system without reasonable cause to believe that such procedures and system were not being complied with.
15 U.S.C. §78o(b)(4)(E).
In the federal counterpart statute, three elements must be shown to support a finding of a reasonable failure to supervise:
1. a violation of a securities statute, rule, or regulation;
2. by a person subject to his supervision; and
3. a failure to reasonably supervise that subordinate.
See 15 U.S.C. §78o(b)(4)(E); In the Matter of the Stuart James Co., Inc., [1992-93 transfer binder] CCH Fed.Sec.L.Rep. ¶85,129 at 84,089-90.
The Hearing Officer, however, was silent as to whether he found that all three of these elements were required to support a finding of a reasonable failure to supervise under G.L.c. 110A, §204(a)(2)(J), even though the answer could have substantial consequence. As to the first and second element, the federal statute requires a finding that there was a violation by a person under the respondent’s supervision. Failure to supervise someone else’s failure to supervise is not enough because “deficient supervision by a subordinate is not a violation within the meaning of that section.” Id. at 84,090. Rather, there must be a showing that the respondent failed to supervise a subordinate who directly violated an antifraud provision. Id.
The requirement of a violation may not apply to G.L.c. 110A, §204(a)(2)(J) because of the difference in language between the two provisions: While the federal statute speaks of a failure “reasonably to supervise, with a view to preventing violations of the provisions of such statutes, rules, and regulations, another person who commits such a violation,” 15 U.S.C. §78o(b)(4)(E) (emphasis added), the Massachusetts statute speaks of a failure “reasonably to supervise agents ... to assure compliance with this chapter,” and does not specifically require a finding of a violation by a subordinate. G.L.c. 110A, §204(a)(2)(J). Indeed, the Commentary to the Uniform Securities Act specifically declares that proof of a violation by an agent is not essential to an order premised on a failure reasonably to supervise. Uniform Securities Act, §204, Comment (Clause B), Uniform Laws Annotated (Business and Financial Laws) (1985) at 545. Consequently, it is not clear from the Hearing Officer’s findings of fact or conclusions of law whether he believes that a finding of a failure reasonably to supervise requires a finding of a direct violation by a subordinate and the answer is not so clear that this Court will decide the issue without first knowing the position of the Hearing Officer and the Acting Director.
Nor is it clear from the Hearing Officer’s findings of fact or conclusions of law whether he found under G.L.c. 110A, §204(a)(2)(J) that the person committing the violation or engaged in misconduct must be subject to the supervision of the respondent. This is plain from the language of the federal statute, which permits sanctions against a registrant for failure reasonably to supervise a person only “if such other person is subject to his supervision.” 15 U.S.C. §78o(b)(4)(E). Certainly, one would think that this would be a requirement under the state provision since it is difficult to imagine how one can justly be sanctioned for failing reasonably to supervise an agent not subject to one’s supervision. Yet, this issue is never addressed even when, as shown below, the Hearing Officer found that a person who supervised no one had failed reasonably to supervise.
C. The Factual Basis for Administrative Sanctions[2]
The evidence at the hearing established that HJM is a broker-dealer, incorporated in New York State and *60 headquartered in Rochester, that had been registered with the Massachusetts Securities Division since March 1988. Until June 9, 1997, HJM maintained a branch office in Boston. Although HJM executed all types of trades for its customers in publicly traded stocks, bonds, and mutual funds, it carved out a specialized niche in the micro-cap and small-cap market, bringing many such companies to Initial Public Offering as an underwriter.
The Securities Division, in its case-in-chief, called five registered agents (sometimes referred to as brokers or brokerage agents) formerly employed by HJM (Robert Nagel, Kurien Kodiattu, Ronald Rosenblatt, Bryan Jalbert, and Jason Smith), and five unhappy customers who formerly had invested their savings with HJM brokers (George Yu, Ronald Alley, Sr., Gary Kovner, Robert Wall, and Arthur Holmes). In rebuttal, it called James Fox, the branch manager and compliance manager of the Boston office from March 1, 1997 until the office closed on June 9, 1997.
Virtually the entire focus of the Securities Division’s case was on the conduct of HJM’s Boston branch office. Tobin Senefeld was the branch manager of the Boston office, responsible for all branch operations, from September 1995 until March 1, 1997, when he was replaced by Fox.[3] Jim Nestor was the branch compliance officer until March 1, 1997, when he, too, was replaced by Fox and moved into operations. Although the crux of the Securities Division’s case focused on Senefeld’s misconduct as branch manager and Nestor’s ineffectiveness as branch compliance officer, neither Senefeld nor Nestor were named respondents in this action and neither testified at the hearing. The record demonstrated that numerous brokers in the Boston office made many misrepresentations to actual and potential customers concerning:
their implied possession of inside information;
their need to complete a sale in order to win a sales contest;
guarantees as to stock performance;
the definiteness and imminence of governmental approvals; and
their own identity.
In addition, the record demonstrated that numerous brokers in Boston failed adequately to disclose the risks of certain speculative investments and sold speculative stocks regardless of their suitability to individual investors.
The record also demonstrated that Boston brokers were placed under severe pressure to meet ambitious sales goals, both as to overall sales and as to particular stocks either owned by HJM or brought public by HJM. As part of this pressure, some brokers were discouraged from executing certain “sell’’ orders from customers regarding stocks owned or brought public by HJM. The record also reflects that HJM, both firmwide and in the Boston office, encouraged its brokers to increase sales through special sales contests. Some of these contests rewarded sales of a particular stock, such as Palomar Medical Technologies, Inc. (“Palomar"), which HJM made a market in and had underwritten when it first went public. The record also demonstrated that, while commissions paid by HJM customers were fixed at a maximum of 4.5 percent for all stocks, a broker who sold stocks in which HJM was a market maker could potentially earn more than the usual commission because he may be paid a percentage of HJM's trading profit. This meant that a broker often could earn more for himself by selling stocks in which HJM made a market, referred to as principal transactions, than by selling stocks listed on the New York Stock Exchange, referred to as agency trades.
The focus of this decision is not on whether there was substantial evidence to support the administrative sanctions against HJM, since that broker-dealer has not pressed this appeal. Nor is the focus on whether there was substantial evidence to support administrative sanctions against Senefeld and Nestor, who ran the Boston branch office during most of the time period in question, since they were never made respondents. Rather, the focus must be on whether there was substantial evidence in the record to support the administrative sanctions imposed against the five plaintiffs:
James A. Villa, HJM’s President, Chief Executive Officer, director, and the indirect owner of 99.5 percent of HJM’s stock;
Robert Setteducati, HJM’s Executive Vice President and Chief Operating Officer;
Michael Bergin, HJM’s Regional Sales Manager, responsible for sales in the Northeast region, which included the Boston branch office;
Joseph Galligan, Sr., an HJM employee who serves as a corporate advisor reporting to Villa; and
Gary C. Liddicoat, HJM’s Chief Compliance Officer.
This Court will examine the evidence against each respondent in reverse order.
1. Gary C. Liddicoat, HJM’s Chief Compliance Officer
The evidence is undisputed that Liddicoat did not become employed by HJM until September 1996, when he assumed his present responsibilities as Chief Compliance Officer and Assistant General Counsel after spending eleven years as assistant compliance director with another brokerage firm. The Hearing Officer found that Liddicoat violated G.L.c. 110A, §204(A)(2)( J) by failing reasonably to supervise agents or other employees to assure compliance with Chapter 110A but it is not at all clear from his findings how Liddicoat failed in this respect. The Hearing Officer’s conclusions of law state, “A compliance director may be held responsible for failing to adequately supervise account executives if the compliance director has been *61 given the responsibility to ensure that the firm adopts and enforces adequate supervisory and compliance procedures and fails to do so." Decision at 78. Yet, when one looks at the Hearing Officer’s findings concerning Liddicoat, there is nothing to support ai finding that he unreasonably failed in his supervisory obligations in this respect. The Hearing Officer appears to base his finding of a supervisory failure by Liddicoat on five factual findings, all of which derive from Liddicoat’s own testimony at the hearing:
11. Liddicoat did not know who was in charge of sales in the Boston office even after the Boston Herald articles in April 1997 critical of HJM's Boston office.
This fact, standing alone, does not amount to anything, especially since there was no evidence of any misconduct in the Boston office by Senefeld after April 1997.
12. Liddicoat did not visit the Boston office until mid-April 1998.
This information is supposedly found in Liddicoat’s testimony in Volume 28 at page 3835. The record contains only 27 volumes and page 3835, in Volume 10, says no such thing. In fact, Liddicoat testified that he visited the Boston office in October 1996. AR at 3695-96.
13. Liddicoat, as chief of compliance, did not have the authority to fire brokers or branch managers.
This can hardly be deemed a reasonable failure by him to supervise.
14. Liddicoat did not directly have the authority or power to direct the conduct of HJM’s brokers.
This also cannot support a finding of a reasonable failure by him to supervise.
15. HJM’s General Counsel, Michael Brown, did now show Liddicoat the affidavits in the Gruntal litigation by the departing HJM brokers which complained about HJM’s sales practices.
It is not clear why the failure of HJM's General Counsel to share this information with Liddicoat supports a finding that Liddicoat failed reasonably to supervise. It should also be noted that the Securities Division did not make Brown a respondent in this action.
It is not surprising that all of the findings pertinent to Liddicoat came from Liddicoat’s own testimony, since virtually all of the evidence proffered by the Securities Division spoke of events that pre-dated Liddicoat’s arrival at HJM. All of the improper conduct by HJM brokers in Boston described by the five testifying customers pre-dated Liddicoat’s arrival at HJM. Of the five registered agents who testified in the Securities Division’s case-in-chief, two left HJM before or about the time Liddicoat joined HJM: Nagel left in August 1996 and Smith in September 1996. Jalbert remained with HJM until February 1997 but he did not identify in his testimony any misconduct that occurred after September 1996. Kodiattu remained with HJM until June 1997, but he. too, did not identify any misconduct that occurred after September 1996. Rosenblatt also remained with HJM until June 1997, and he. too, did not identify any misconduct that occurred in Boston after September 1996. Indeed. Rosenblatt testified that Senefeld "calmed way down” after the Boston Herald articles in April 1997 and that the office became "like a library,” in that brokers were leaving and the office became very quiet. AR at 2203, 2207-08.
James Fox, who testified for the Securities Division in rebuttal, testified that he was repeatedly pressured by Setteducati. Bergin, and William Masucci (HJM’s National Sales Manager) to increase sales when he served as branch manager in Boston from March 1997 until the office closed in June 1997. Even if this pressure were deemed inappropriate, none of these men were subject to Liddicoat’s supervision.[4]
In short, there is not substantial evidence to support the conclusion that Liddicoat failed reasonably to supervise at any time from September 1996 until June 9, 1997, when the Boston office closed down. The Final Order suspending his registration as a broker-dealer agent for two years and fining him $5,000 is hereby REVERSED, the Final Order against him VACATED, and the case against him DISMISSED.[5]
2. Joseph Galligan, Sr., an HJM employee who serves as a corporate
advisor reporting to James Villa
The evidence is undisputed that Galligan was a corporate advisor who acted as a consultant and reported directly to Villa. AR at 4846; Decision at 57. He had no formal responsibilities; no one reported to him. AR at 4846. His job was to travel to the various HJM branch offices every six or seven weeks, speak with the branch managers and brokers to learn how they were doing, and report this information back to Villa. AR at 4846-61. In both 1995 and 1996, he visited the Boston office between six and eight times each year, during which he spoke to Senefeld, Nestor, and the brokers. AR at 4849. Galligan discussed specific products with the Boston brokers during these visits. Decision at 16-17. The Hearing Officer declared in his findings that Galligan “never observed any violations of the securities laws during his visits to the Boston office." Decision at 58. Yet, somehow, the Hearing Officer concluded that Galligan willfully violated G.L.c. 110A, §101, engaged in unethical or dishonest conduct or practices in the securities business, in violation of G.L.c. 110A, §204(a)(2)(G), and failed reasonably to supervise agents or other employees to assure compliance with Chapter 110A, in violation of G.L.c. 110A, §204(a)(2)(J).
There is absolutely no basis provided for these legal conclusions and there is not substantial evidence in the record to support them. There is only one finding of fact by the Hearing Officer that Galligan did any *62 thing wrong and there is not substantial evidence in the record to support that finding. The Hearing Officer found that Galligan frequently gave the Boston brokers talking or selling points for Palomar, and these sales points never mentioned risk. Decision at 30. Yet, when one looks to the record citations in support of these findings, they turn out to be based on very little. The Hearing Officer cited Nagel’s testimony in support of the finding that Galligan frequently gave the Boston brokers talking or selling points for Palomar. Yet, the transcript of the relevant portion of Nagel’s testimony reads as follows:
Q. Were you given any talking points or selling points about Palomar?
A. I think every week there was a new selling point for Palomar.
Q. Who gave those to you?
A. Tobin Senefeld.
Q. Anyone else?
A. Well, yes. Mike Bergin, the regional manager, was in the office on several occasions. Joe Galligan was in the office on several occasions. There was always — there was, you know, frankly, there was inside information that was, you know, put out there for us.
AR at 1639-40. It is not at all clear from the record that Galligan actually gave any talking or selling points about Palomar or, if he did, what he said or did with respect to these talking or selling points, beyond the fact that he “was in the office on several occasions.” This falls far short of substantial evidence in support of the violations found by the Hearing Officer. Although not mentioned in the Hearing Office’s Decision, Nagel later did testily that he questioned Galligan “about the business practice of doing nothing but buy Palomar.” AR at 1714. However, Nagel did not testily to Galligan’s response. Consequently, the worst that can be said about Galligan on this record is that he often visited Boston as the “eyes and ears” of HJM’s Chief Executive Officer while some brokers in that branch office were engaging in securities violations with customers and that he once was told that the brokers were pressing their customers to buy Palomar. This is not enough to constitute substantial evidence that Galligan participated in some fashion in a securities violation, engaged in unethical or dishonest conduct or practices, or failed reasonably to supervise, especially in light of the finding of the Hearing Officer, adopted by the Acting Director, that Galligan “never observed any violations of the securities laws during his visits to the Boston office.” Decision at 58. Indeed, as to the last violation, the evidence is undisputed that he did not supervise anyone. Therefore, the Final Order revoking his registration as a broker-dealer agent and fining him $10,000 is hereby REVERSED, the Final Order against him VACATED, and the case against him DISMISSED.
3. James A. Villa, HJM's President, Chief Executive Officer, director, and the indirect owner of 99.5 percent of HJM's stock; Robert Setteducati. HJM’s Executive Vice President and Chief Operating Officer; and Michael Bergin, HJM's Regional Sales Manager, responsible for sales in the Northeast region
With respect to Villa, Setteducati, and Bergin, the issue of whether the Hearing Officer’s findings of fact are supported by substantial evidence is far closer than with Liddicoat and Galligan. This Court, from its own review of the record, could decide that the evidence against Liddicoat and Galligan was inadequate as a matter of law regardless of the conclusions of law actually reached by the Acting Director of the Securities Division: The issue is not so clear with Villa, Setteducati, and Bergin, and this Court is unwilling to make this determination on a record that is tainted by errors of law of the Hearing Officer, uncertainty as to the conclusions of law actually reached by the Acting Director of the Securities Division, and the absence of any explanation for the severe administrative sanctions imposed. The Hearing Officer and, in turn, the Acting Director, as discussed earlier, appear to have believed that a finding of violation against these three plaintiffs could be premised on their vicarious responsibility for the actions of subordinates and the inadequacy of an affirmative defense. It is not clear what their findings of fact and conclusions of law would be if they acted in accordance with the correct legal standard. The prudent course is to remand this action to the Secretary for revised findings of fact and conclusions of law consistent with this decision. Therefore, this Court hereby REVERSES the October 29, 1998 Final Order of the Acting Director of the Massachusetts Securities Division as it applies to Villa, Setteducati, and Bergin, and REMANDS the case to the Secretary for further action consistent with this decision. If, upon remand, a Final Order shall issue against Villa, Setteducati, and Bergin, that Final Order shall be stayed pending further order of this Court if these respondents seek judicial review of that Order under G.L.c. 30A, §14. This Court shall retain jurisdiction of this action.
ORDER
For the foregoing reasons, it is hereby ORDERED that:
1. As to the plaintiffs Gary C. Liddicoat and Joseph Galligan, Sr., the October 29, 1998 Final Order of the Acting Director of the Massachusetts Securities Division is hereby REVERSED , the Final Order against them VACATED, and the case against them DISMISSED.
2. As to the plaintiffs James A. Villa, Robert Setteducati, and Michael Bergin, the October 29, 1998 Final Order of the Acting Director of the Massachusetts Securities Division is hereby REVERSED and the case is REMANDED to the Secretary of the Common *63 wealth for further action consistent with this Memorandum of Decision and Order.
3. If, upon remand, a Final Order shall issue against the plaintiffs Villa, Setteducati, and Bergin, that Final Order shall be stayed pending further order of this Court if the plaintiffs seek judicial review of that Order under G.L.c. 30A, §14. This Court shall retain jurisdiction of this action.

he original complaint was filed on July 7, 1996 against HJM, Villa. Setteducati, Masucci, Bergin, and “all persons currently or formerly registered in Massachusetts as agents of investors H.J. Meyers, Inc. during 1996 and 1997.”

This Court has reviewed the entire record and read the nearly 4,000-page transcript of the hearing. It is the time-consuming nature of that review, almost all of which occurred on nights and weekends because of the press of other judicial matters, that explains in large part the delay in issuing this decision.

Senefeld remained in the Boston office until it closed. There was a dispute as to precisely what position he held in that period. The Securities Division contended that he remained as sales manager, and effectively ran the sales operation at the branch until it closed.

It should be noted that Fox did not testify that any of their telephone calls resulted in improper sales presentations to customers.

This Court has previously noted that the imposition of a fine against Liddicoat was an error of law, since G.L.c. 110, §204(a)(2)(J) does not permit a fine as an administrative sanction for a failure reasonably to supervise.